IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHNNY RAY TAYLOR, JR. | ) | |
| AIS #242152, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:19-CV-700-MHT-CSC |
| | ) | |
| WEXFORD HEALTH SOURCES., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Johnny Ray Taylor, Jr. ("Plaintiff"), who is incarcerated at the Staton Correctional Facility ("Staton"), in Elmore, Alabama, has filed, pro se, this civil rights action pursuant to 42 U.S.C. § 1983, seeking relief for certain claimed violations of his federally protected rights. This action for damages involves a dispute over the adequacy of medical care and treatment afforded Plaintiff while confined at Staton. Plaintiff's complaint, as amended and supplemented, brings suit against Defendant Warden Joseph Headley ("Defendant Headley"), Defendant Wesley Barry, M.D. ("Defendant Barry"), and Defendants Wexford Health Sources, Inc.,[1] Rhonda Thomas, CRNP, and Guillaume Anthony, LPN ("Wexford Defendants"). *See* Docs. 1, 12, 37, 41, 42, 43, 47, 58.

Defendants Headley and Barry filed an answer, special report, and supporting evidentiary materials addressing Plaintiff's claims for relief. Docs. 13, 14, 16, 17. Wexford Defendants also filed an answer, special report, supplemental special report, and supporting evidentiary materials addressing Plaintiff's claims for relief. Docs. 23, 31, 32, 49. In these documents, all defendants deny they acted in violation of Plaintiff's constitutional rights. Upon receipt of Defendants Headley and Barry's special reports and Wexford Defendants' special report and supplemental special report, the Court issued an Order providing Plaintiff an opportunity to file a response. Doc. 51. The Order informed Plaintiff that his response should be supported by affidavits or statements

---

[1]     Defendant Wexford is "the entity that currently holds the contract with the Alabama Department of Corrections ("ADOC") to provide healthcare related services to Alabama state incarcerated inmates. Defendant Wexford has held the contract with the ADOC since April 1, 2018. Doc. 31-1 at 2.

made under penalty of perjury and other evidentiary materials. *Id*. at 1-2. The Order further cautioned Plaintiff that unless "sufficient legal cause" is shown within ten days of entry of this Order "why such action should not be undertaken, upon the expiration of the time for the plaintiff to file a response as allowed by this order, the court may at any time thereafter and without further notice to the parties (1) treat the special reports and any supporting evidentiary materials as motions for summary judgment, and (2) after considering any response as allowed by this order, rule on the motions for summary judgment in accordance with law." *Id*. at 2. Plaintiff filed responses to all defendants' answers and special reports. Docs. 35, 52. This case is now pending on (1) Defendant Headley's motion for summary judgment (Doc. 13); (2) Defendant Barry's motion for summary judgment (Doc. 16); and (3) Wexford Defendants' motion for summary judgment. Doc. 31.

Upon consideration of all motions, the evidentiary materials filed in support thereof, and Plaintiff's opposition, the Court concludes that all three motions for summary judgment (Docs. 13, 16, 31) are due to be GRANTED.

## I. Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id*. at 322-324.

When a defendant meets his or her evidentiary burden, as all defendants here have, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th

Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint when considering summary judgment). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. At the summary judgment stage, this Court should accept as true "statements in [Plaintiff's] verified complaint, [any] sworn response to the [Defendants'] motion[s] for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 2019 WL 1785355, *3 (11th Cir. April 24, 2019); *see also United States v. Stein,* 881 F.3d 853 (11th Cir. 2018) (holding that a plaintiff's self-serving and uncorroborated, but not conclusory, statements in an affidavit or deposition may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. .

. . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'").  However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact.  *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, a plaintiff's pro se status alone does not mandate the Court disregard elementary principles of production and proof in a civil case.  Here, Plaintiff fails to demonstrate a requisite genuine dispute of material fact to preclude summary judgment on his claims asserted against all defendants.  *See Matsushita*, 475 U.S. at 587.

## II.    Factual Background

Plaintiff commenced this pro se action for alleged violations of his federally protected constitutional rights while incarcerated at Staton.  Doc. 1; *see also* Docs. 12, 37, 41, 42, 43, 47, 58.  Plaintiff alleges, *inter alia*, that he received inadequate medical care and treatment while at Staton by Wexford Defendants, that medical staff at Staton failed to recognize or treat his notable weight loss over two years, that Defendant Barry, an outside specialist, provided substandard treatment of Plaintiff's hernia repair, and that the copays Plaintiff is charged are fraudulent and excessive.  For relief, Plaintiff seeks, *inter alia*, monetary damages and requests the Court to notify Defendant Barry of Plaintiff's discomfort and ongoing pain and suffering.  *See* Doc. 1 at 4.

Plaintiff's claims stem from the following facts, viewed in the light most favorable to Plaintiff:

Pursuant to Plaintiff's medical records, since January 2018, Plaintiff suffered from and sought treatment from Staton medical personnel for his left hernia pain.  *See e.g.*, Doc. 31-2 at 2-5.  In response to Plaintiff's complaints, medical personnel prescribed Plaintiff ibuprofen.  *See e.g.*, *id.* at 5-6.  Medical personnel continued to prescribe Plaintiff pain medication for his left

hernia pain in 2019. *Id*. at 6-7. On March 8, 2019, Plaintiff was seen and treated by Defendant Wexford's medical personnel for Plaintiff's left inguinal hernia pain. *Id*. at 8. Plaintiff was directed to follow-up with medical personnel if his discomfort did not improve. *Id*. A few days later, on March 13, Defendant Wexford's medical staff made an off-site referral request for a surgeon to examine Plaintiff's left inguinal hernia. *Id*. at 11. On March 18, Plaintiff's medical records show that a "utilization management" was submitted for [Plaintiff] for a left inguinal hernia repair, along with a "utilization management" for a colonoscopy due to Plaintiff's complaints of pain in his left abdomen. Doc. 32-1 at 4; *see also* Doc. 31-2 at 15. "An alternative plan was submitted of care for the repair of the left inguinal hernia as well as a resubmission for a colonoscopy if the abdominal pain was not resolved." Doc. 32-1 at 5.

While Plaintiff was originally scheduled to see Defendant Barry on April 16, due to an emergency surgery, Defendant Barry rescheduled Plaintiff's appointment and examined Plaintiff on April 23, 2019. Doc. 31-2 at 17, 21. On April 16, a nurse noted on a "release of responsibility form" that a sick call Plaintiff sought was not needed because, after Defendant Thomas reviewed Plaintiff's chart, Plaintiff denied any symptoms. *Id*. at 18. Plaintiff was instructed "to come to the ER if symptoms recur." *Id*. Plaintiff signed this release from responsibility form. *Id*.

Defendant Barry is a licensed physician in the state of Alabama. Doc. 16-1 at 2. Defendant Barry testifies:

> On April 23, 2019, I saw Plaintiff…at the request of Dr. Michael Borowitz of Staton Correctional Center in my office. [Plaintiff] presented with a left inguinal hernia associated with pain. I reviewed the Referral Request provided by Wexford Incorporated and performed a physical examination of the patient. [Plaintiff] was in no distress. He did have a large left inguinal hernia. Additionally, there was the presence of a very small, early hernia on his right side. [Plaintiff] was not aware that he had a right hernia until I notified him of such. The right hernia was inconsequential and posed no danger to [Plaintiff].
>
> On April 23, 2019, [Plaintiff] was scheduled for surgery to repair his left inguinal hernia. The surgical repair was performed on May 17, 2019 at Jackson Hospital. There were no complications.
>
> [Plaintiff's] post-operation visit was scheduled for May 30, 2019. [Plaintiff] never appeared for the post-operation visit. I have neither provided, nor been requested to provide medical services to [Plaintiff] since May 17, 2019.

*Id*. at 2-3; *see also* Docs. 16-2 at 2-5, 16-4 at 2-4. Plaintiff's medical records corroborate Defendant Barry's testimony that on May 17, 2019, Defendant Barry performed hernia surgery on

Plaintiff's left inguinal hernia and that Plaintiff left in "satisfactory general condition."  Docs. 16-3 at 2-3.  After his hernia surgery, Plaintiff was prescribed, *inter alia*, Tylenol and Tums Chewable Tablets to be taken as needed.  Doc. 31-2 at 34.  When discharged from Jackson Hospital, Defendant Barry instructed Plaintiff to use ice packs and wear scrotal support as needed.  *Id*. at 41. While Plaintiff was directed to return to Defendant Barry on May 30 for a follow up appointment (*see id*. at 44, 47-48), Plaintiff's medical records do not show that Plaintiff attended this follow up appointment.  *See* Doc. 31-2.  Defendant Wexford's medical personnel continued to monitor Plaintiff's condition after his surgery when Plaintiff returned to Staton.  *See e.g*., *id*. at 40.  On May 18, Plaintiff told Staton medical personnel that he felt "good" and that he was "ready to go back to camp."  *Id*. at 42.  Defendant Wexford's medical staff directed Plaintiff to follow-up with his "Provider" on May 22 and to clean and dry his incision four times per day.  *Id*. at 46.  Also on May 18, medical staff dictated in Plaintiff's records that, from May 18 through July 13, Plaintiff was not permitted to lift anything greater than ten pounds and from May 18 through June 18, Plaintiff was permitted use of an ice pack.  *Id*.  "Lab tests contained in [Plaintiff's] chart from May 2019 reveal no indication of organ disease or anemia."  Doc. 32-1 at 5.

On June 7, Plaintiff submitted a sick call request and asserted: "I need a follow up with the provider, [Defendant Thomas].  Also need to renew my [ibuprofen].  Had a follow for surgery?" Doc. 31-2 at 50.  A nurse responded to Plaintiff's sick call that same day.  *Id*.  The next day, Plaintiff was seen by Defendant Wexford medical personnel for his post-op pain and was prescribed ibuprofen.  *Id*. at 51.  According to Plaintiff's copay records, on June 8, because Plaintiff was deemed "indigent," Plaintiff received a waiver of co-pay for his "over the counter" prescription as well as the copay for seeing the nurse.  Doc. 1-1 at 1.

On July 3, 2019, Plaintiff submitted a medical grievance in which Plaintiff asserts:

I was seen at sick call on 6/8/2019, I wanted to renew my [ibuprofen] for my hernia surgery.  I was charged but never saw the provider.  Also, I was told to have [a follow up] with [Defendant Barry].  Never saw him.  I also put in for glasses about the same time, nothing has been done for me.  I can't understand what the problem is.  I don't like to bother the Health Care, but I need medical attention.  Also having migraines and need something for pain.  The glasses were for my PTF class.  Now I don't attend this class for the simple reason I did not see the Eye Dr.  [T]he nurse at sick call told me I would.  I would appreciate you[r] attention to this matter. . . .

Doc. 31-2 at 52.  On July 5, Plaintiff received the following response from Defendant Anthony: "Good Evening, I understand your frustration and have scheduled you an appointment on 7-8-2019

to see the provider." *Id*.  Also on July 5, Plaintiff submitted a sick call request asserting: "Pain in groin area, had hernia surgery, migra[i]nes, or ear ache." *Id*. at 54.  This request was responded to by a nurse that same day and Plaintiff was scheduled for a sick call appointment.  *Id*.  The next day, Plaintiff signed a "release of responsibility form" refusing medical treatment. *Id*. at 55.

On July 11, 2019, Plaintiff submitted another sick call request and asserted: "I need a follow up on my hernia surgery, and to renew my medications, and A/D ointment. This is my 3rd sick call." *Id*. at 56.  That same day, Plaintiff was referred to his medical provider.  *Id*.  On July 15, Plaintiff failed to show for the appointment with his provider.  *Id*. at 57.  Plaintiff's medical records indicate that on July 24, medical personnel requested a refill of Plaintiff's pain, allergy, and lotion medications.  *Id*. at 58.

Approximately three weeks later, on August 15, Plaintiff requested ibuprofen and a follow-up on his hernia surgery.  *Id*. at 59.  Plaintiff's medical records show that, on August 15, a nurse scheduled Plaintiff to be seen by medical personnel.  *Id*.  The next day, Plaintiff drafted a medical grievance asserting: "I was to be put in to see the provider about my hernia. [Defendant Anthony] was to schedule this appointment.  I have yet to see the provider, also I went to see [Defendant Thomas] on or about 7-18-2019.  She was to order [insoles] for my feet.  Also my [ibuprofen] has run out and I need it for my pain, hernia, and back trouble." Doc. 49-2 at 3.  While Defendant Anthony responded to this grievance on September 5, 2019 (*see id*.), Plaintiff was seen by Defendant Wexford's medical staff for his pain on August 16. Doc. 31-2 at 61.

On August 22, Plaintiff drafted a sick call request asserting he needed ibuprofen for his hernia and back pain.  *Id*. at 62.  There is no response from medical personnel on this sick call request.  *Id*.  Two days later, on August 24, Plaintiff submitted another sick call request, again asking for medication to treat his pain.  *Id*. at 64.  Medical personnel responded to this sick call on August 24 and 25.  *Id*.

On August 25, Plaintiff received a medical examination after being involved in an inmate-on-inmate incident.  *Id*. at 65.  Plaintiff asserted to medical personnel: "I was trying to stop them from getting into it and the lil' young light skinned dude slapped me to the ground and when I got up, he hit me again." *Id*.  Plaintiff further stated that this incident impacted his ability to hear from his right ear.  *Id*.  Other than noting Plaintiff's verbal complaints as to his right ear, medical personnel did not observe any injury to Plaintiff.  *Id*.

Also on August 25, Plaintiff submitted a medical grievance in which Plaintiff asserts:

> I was to have an appointment 8/25/2019.  They said they could not find my jacket.  I went to sick call on 8-24-2019.  Saw the nurse about my spinal scoliosis and hernia. . . .  I was told to go to pill call and was told at pill call no order for my [ibuprofen] was filled.  I have been without my pain meds for about little over a [week].  I don't understand the problem.  They charged me for about 8 sick calls and have done nothing for me.  Also I ordered [insoles] for my boots to help [alleviate my back and hernia].  I am being charged and refused for medical treatment. . . .

*Id*. at 66.  On August 28, Plaintiff received the following response from Defendant Anthony: "Good evening, I understand your situation but all your pain meds prescriptions have expired.  If you need more pain meds you need to put in a sick call."  *Id*.

> On September 2, 2019, Plaintiff submitted another medical grievance in which he asserts:

> This is my third grievance in a [week].  I still have no response.  I had an appointment with [Defendant Thomas] about my health care problems.  I was told they lost my jacket, and was sent away.  No one has taken me seriously.  I've been to sick call, signed co-pay, and no medicine.  In 17 years, I've never seen anything like this.  Also went to KOP was sent away now I'll be behind in medication.  They are refusing me treatment, and this is wrong.

*Id*. at 68.  The next day, Defendant Anthony responded to Plaintiff's grievance and asserted: "Good Evening, I understand your situation but what medicine are you speaking of for KOP? All your meds are valid for KOP."  *Id*.  On September 4, Plaintiff was seen by medical personnel and was provided a "Double Truss" for his hernia pain.  *Id*. at 69-71.  On September 6, 2019, Plaintiff submitted the following medical grievance:

> Saw provider around 9/3/2019.  Still no answer as to my weight loss.  Also medication was to be renewed.  Went to pill call told it was not.  No one seems to care about my health?  [sic] But I do.  I'm being charged co-pays for the same symptoms.  And still no relief.  In 17 [years], this is ridiculous and not to mention cruel and unusual punishment.

Doc. 49-2 at 6.  Defendant Anthony replied on September 9 and stated: "Good Evening, I understand your situation, but what meds need renewing?  How are you being mistreated?"  *Id*.

> On September 12, Plaintiff submitted a grievance appeal in which he asserts:

> [Defendant Anthony]:  I have over 13 sick calls in the last 2 [months].  I've had surgery and…to need surgery. If you only looked at your computer or records you would see this is an ongoing condition.  I have been charged over an over and over again for conditions that that should be chronic conditions.  My record was also lost.  I've put in sick calls and never got seen also.  This is most ridiculous SIR.

8

> Most of this should be follow [sic] or chronic care.  You want to know how I've
> been mistreated then you should read the grievances I've filed SIR.

Doc. 41 at 9.  On September 13, Plaintiff was prescribed a refill of his ibuprofen.  Doc. 31-2 at 71.

On September 17, Defendant Anthony sent Plaintiff the following response to Plaintiff's

September 12 appeal: "Good Evening, I understand your situation[,] but Alabama Dept. of

Correction determine what is chronic care.  The disease[s] that [are] listed on chronic care are High

Blood Pressure, Diabetes, Seizures, HIV, Hyperlipidemia these are free.  Any other problems,

there is a charge."  Doc. 41 at 9.

> On October 3, 2019, Plaintiff submitted another medical grievance in which he asserts:
>
> I was seen at sick call on 9/24 and 9/26.  I told the nurse I needed to renew
> my medications KOP.  That was on 9/24.  On 9/26 I again went to sick call about
> an assault and that my hearing in my right ear is almost gone from the assault.  I
> have body chart and I also made note on 9/26/2019 about my KOP.
>
> Here it is 10/3/2019, no response.  My ear still hurting and hearing bad, also
> I am having congestion which I have mentioned in a previous sick call.  My
> medication run out in a couple of days.
>
> Need medications, also HELP with my ear and congestion.

Doc. 49-2 at 7.  Defendant Anthony replied on October 8, with the following response:  "Good

Evening, I understand your situation and you had your follow up for your ear on 9/13/2019 from

your initial 9/4/2019 complaint.  If you are still having problems with your ear, put in another sick

call."  *Id*.  The next day, Plaintiff submitted another medical grievance in which Plaintiff asserts:

"Yes, I went to sick call on 10/3/2019.  Was told I would see the provider.  Not so.  They sent me

to sick call again.  My medicine ran out over a [week] ago.  This is not acceptable.  What is the

problem.  My Zantac, Tums, AD, Zyrtec all ran out over a [week] ago.  I need HELP!"  *Id*. at 8.

> On October 17, 2019, Plaintiff drafted two medical grievances, a medical appeal, and a

request for accommodation.  In one medical grievance, Plaintiff asserts:

> Yes I have put in sick calls about my weight loss, been seen by [Defendant Thomas]
> and still no answer as to why.  Their [sic] have been no blood test or exam.  I have
> lost over 54 pounds in 2 [years].  Think I need a test and also a nutritional
> supplement as to my weight loss, also vitamins to supplement my health.  I am
> asking you nicely to see what the problem is.  And why my medical needs are being
> ignored.  I have been incarcerated for over 17 [years].  And at this time, this medical
> treatment or lack of is [unacceptable]. I am billed co-pays and no one is taking me

serious.  Also I had a sick call for a growth to my leg.  [Defendant Thomas] told
me to put in another sick call.

*Id*. at 9.  There is no written response to this grievance.  *See id*.  In Plaintiff's second October 17
medical grievance, Plaintiff asserts:

Yes, I was seen at HCU on 10/17/2019, I was to have my KOP renewed.
[Defendant Thomas] did not renew my Zyrtec.  I have been without my medicine
for over a [week].  Mrs. Waugh saw me for an assault to my ear.  She would not
renew my medicine.  I can not [sic] understand why.  I went to sick call several
times, the lady at sick call treated me for my busted ear drum and put me down to
see the provider.  She said to let her know of my medicine.  She never said put in a
sick call.  I have never [run] out of my medicine till now.  I can't understand why I
have put in sick calls been seen and still don't have my medicine.  Would you please
check what the problem is[?]  Thank you.

*Id*. at 11.  The grievance was received on October 17, but only contains the following response:
"Good E."  *Id*.  In his October 17 grievance appeal, Plaintiff asserts:

I am writing this appeal in regards to all my other grievances that I have submitted.
This standard of HEALTH CARE is unacceptable.  If you can't keep it together,
that's not my fault.  I have paid co-pays over and over, for illnesses that I have
[incurred] over 17 [years].  Incarcerated, but when I need you you've not been there.
I was well for almost 13 [years] of the 17 [years].  Now I am having problems no
one seems to care.  I have been polite and respectable to you all.  Now I am being
treated as if I am the problem.  Well excuse me.  You are dealing with lives here,
not cattle.  GOD forgive you all, for I do.

*Id*. at 10.  There is no written response to this appeal.  *See id*.

As to Plaintiff's October 17 request for accommodation, Plaintiff requested a hearing aid
because, after the assault by another inmate in August, Plaintiff experienced hearing loss in his
right ear.  Doc. 42-1 at 11.  On October 21, Defendant Anthony submitted the following response
to Plaintiff's October 9 grievance: "I spoke to inmate and addressed all of his [concerns relating
to] all four grievances.  He admitted an understanding."  Doc. 49-2 at 8.

The next day, on October 22, 2019, Plaintiff filed another medical grievance appeal in
which Plaintiff asserts:

Yes, I talked to you [Defendant Anthony] on 10/21/2019, you stated that I had to
put in a sick call for every medication that I have to get it renewed.  KOP I don't
understand this is the first time I heard of this.  I have been doing this for [7 ½
years], and now I've ran out of my medicine and need my medicine.  I saw the
provider [Defendant Thomas] as always, now there seems to be animosity towards
me.  I've done nothing wrong.  And can't understand why things have changed.

> I've been in the DOC over 17 [years] and this is the first time this has happened. You keep charging me co pays for preexisting conditions. Now I'm confused. I don't know what to think. This is not personal.

*Id*. at 12.  One day later, a "Mrs. Thompson" responded to Plaintiff's October 17 request for a hearing aid and stated that Plaintiff's request was denied because Plaintiff "does not meet requirements due to a scheduled surgery to repair his busted eardrum."  Doc. 42-1 at 11.

On October 30, Plaintiff received the following response to his October 22 appeal: "Good Evening, I understand your situation and I have scheduled you an appointment with the MD.  Your appointment will be Nov. 15th."  Doc. 49-2 at 12.

On November 11, 2019, Plaintiff submitted a medical grievance in which he asserts:

> Yes I saw the Dr. last [Tuesday], on the 29th.  He renewed and reordered my medicine.  I had been without my Zyrtec for 3 [weeks], also he renewed all other medicine, Tum[s], Zantac, [ibuprofen].  I went to KOP on 11-11-2019, I was told that my medicine was not there, so I went to pill call.  Lady told me I had picked them up.  No I only received my Zyrtec, no tums or [ibuprofen], or Zantac.  The [ibuprofen] ran out on the 10th, also last month I only received a portion of my Tums 2 cards they ran out 2 [weeks] ago.  Mrs. Long either wipe the computer clean or I don't know what, but at pill call I couldn't get my tums or [ibuprofen] that I was getting.  Could you see what the problem is.  This I don't understand. Thank you.

*Id*. at 13.  On November 14, Plaintiff received the following response to his November 11 grievance: "I called over to explain meds.  You have no order for Ibuprofen.  Zyrtec, & A&D given KOP on 11/11/19.  Tums, Miralax, Zantac are available for next KOP pick up.  I do not 'wipe' the computer as you stated.  I give meds that are ordered and received from pharmacy."  *Id*.  Plaintiff asserts, on November 25, 2019, approximately three months after being assaulted by an inmate, Plaintiff received eardrum surgery at Jackson Hospital.  Doc. 35 at 2.

According to Plaintiff's copay records, on November 29 and on December 6 and 24, 2019, Plaintiff, deemed an "indigent inmate," received copay waivers as to his nurse and provider appointments and over-the-counter prescription.  Doc. 42-1 at 7.

On December 26, Plaintiff submitted the following medical grievance: "Yes, I have put in sick calls to get my bottom bunk profile renewed, have not had anyone see me for this.  This is my second grievance. And follow up for ear surgery this month Dec. Also no hernia surgery."  Doc. 49-2 at 14.  Plaintiff's copay records show, on December 27, 2019, Plaintiff, deemed an "indigent inmate," received copay waivers as to his nurse and over-the-counter prescription.  Doc. 42-1 at 7.

On December 30, Defendant Anthony responded to Plaintiff's December 26 grievance as

follows: "Good Evening, I understand your situation, but you must put in a sick call to address this issue." Doc. 49-2 at 14. A few days later, On December 31, Plaintiff filed a medical grievance appeal in which Plaintiff asserts:

> Yes, [Defendant Anthony], on 12/31/19, I picked up my grievances from you Sir. I told you I had addressed the bottom bunk profile in sick calls twice. Also, I was to be scheduled for surgery to my busted eardrum, and that I was to have a follow up with Dr. Evans 12-25-19. Also I have seen the Dr. for my hernia, he told me everything would be taken care of.
>
> You told me to put in a sick call, I have and no results.
>
> SIR. How many times must we go through this. No one is keeping track of anything.

Doc. 43-2 at 5. On January 2, 2020, Defendant Anthony responded to Plaintiff's appeal as follows: "Good Evening, I understand your position, but you will be going in a week or two. I hope this helps you." *Id*. On July 15, 2021, Plaintiff explained to the Court that, while he received two surgeries to his eardrum, he continues to have trouble hearing. Doc. 58 at 1.

Regarding Plaintiff's weight fluctuations from 2017 through 2019, pursuant to Plaintiff's medical chart, on March 29, 2017, Plaintiff, who's height is 5'4", weighed 155 pounds. Doc. 32-1 at 2. On July 19 and November 24, 2017, Plaintiff maintained his weight at 150 pounds. *Id*. at 3. Plaintiff's medical records reflect, in 2018, Plaintiff's weight in March was 152 pounds and in December was 151 pounds. *Id*. In 2019, Plaintiff was weighed on numerous occasions. *Id*. at 3-4.

As testified by [Defendant Thomas] who is employed as a nurse by Defendant Wexford at Staton, Plaintiff's weight in 2019 fluctuated as follows:

> On February 11, 2019, [Plaintiff] weighed 152 pounds. On March 13, 2019, [Plaintiff] weighed 154 pounds. Subsequent to a recent surgical procedure, [Plaintiff] was weighed on May 18, 2019 and shown to be 143 pounds. On May 22, 2019, [Plaintiff] was weighed and shown to be 137.4 pounds. On July 24, 2019, [Plaintiff] weighed 133 pounds. This calculated a BMI of 23 which would be considered normal for the weight of [Plaintiff]. On August 1, 2019, [Plaintiff's] weight was 130 pounds. On September 4, 2019, [Plaintiff's] weight was 126 pounds. On October 9, 2019, [Plaintiff's] weight was 122 pounds. This calculated to a BMI of 21 which would be considered a normal weight pursuant to the BMI table.
>
> [Plaintiff's] weight on October 16, 2019, was 126 pounds. On November 5, 2019, [Plaintiff's] weight was 123 pounds.

. . . .

> [Plaintiff's] maximum weight for 2019 was 154 pounds and the lease [sic] weight documented was 122 pounds. [Plaintiff] showed a weight loss of 32 pounds.

*Id*. at 3-4.

Additional facts are set forth as necessary.

### III.   Discussion

In his complaint as amended and supplemented, Plaintiff alleges Defendant Barry provided substandard medical treatment because, while Plaintiff had two hernias, Defendant Barry only performed surgery on one hernia. Doc. 1 at 3. Plaintiff maintains, because Defendant Barry failed to perform surgery on his second hernia, Defendant Barry was deliberately indifferent to Plaintiff's serious medical needs. *Id*. at 3-4.

Plaintiff also alleges, notwithstanding the inadequate medical treatment provided by Defendant Wexford and its employees, Plaintiff is nonetheless charged copays for his treatment. Doc. 1 at 5. Plaintiff, therefore, asserts the copay policy is fraudulent. *Id*. Plaintiff contends that Wexford Defendants do not take Plaintiff's pain seriously and Plaintiff has not been properly treated for his severe weight loss or his hernia and ear pain. *Id*. Plaintiff alleges that, because of Plaintiff's weight loss, he fears he has cancer and that medical personnel at Staton are ignoring his symptoms. *Id*. at 6. Plaintiff asserts, given his age and his family history of cancer, he should be provided certain tests to diagnose his weight loss, including colonoscopies. Doc. 12 at 1. Plaintiff further alleges that medical staff are ignoring Plaintiff's growth on his left leg. Doc. 37 at 1.

Defendant Barry moves for the Court to grant his motion pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction) and (b)(6) (failure to state a claim upon which relief can be granted). *See* Docs. 16, 17. Defendant Barry further maintains, to the extent Plaintiff asserts a medical malpractice claim against Defendant Barry, there is no evidence Defendant Barry committed medical malpractice. *Id*.

Defendant Headley, in his special report, argues *inter alia*, because Plaintiff's complaint, as amended and supplemented, alleges no direct actions by Defendant Headley and because Defendant Headley has never been responsible for Plaintiff's medical care, Plaintiff fails to state a deliberate indifference claim against Defendant Headley. Doc. 13. In the alternate, Defendant Headley asserts immunity in his official and individual capacity. *See id*.

Last, Wexford Defendants, in their special report, deny Plaintiff's claims of deliberate indifference. *See* Doc. 31. Specifically, Defendant Wexford argues, because Plaintiff fails to show any policy, practice, or custom of Defendant Wexford which deprived Plaintiff of any constitutional right, Plaintiff's claims sound in *respondeat superior* liability and are, therefore, due to be dismissed. *Id*. at 4-10. Defendants Thomas and Anthony argue that Plaintiff's claims against them are "fundamentally flawed," and fail to show that either defendant was deliberately indifferent. *Id*. at 13-17. Wexford Defendants further contend that Plaintiff has failed to assert any claim for medical malpractice against any Wexford Defendant. *Id*. at 17-23.

### A.  Deliberate Indifference: Standard of Review

Plaintiff asserts all defendants in this action acted deliberately indifferent to his serious medical needs. A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of her constitutional rights. In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To demonstrate a denial of medical care in violation of the Eighth Amendment, Plaintiff must prove both an objective and subjective component. The objective element requires Plaintiff to demonstrate the existence of an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id*. (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one

that, if left unattended, pos[es] a substantial risk of serious harm." *Id*. (quotation marks and citation omitted).

The subjective component of Plaintiff's medical claim requires that he demonstrate "deliberate indifference" to a serious medical need. *Farrow*, 320 F.3d at 1243. Deliberate indifference is shown by establishing that a defendant had actual knowledge or awareness of an obvious risk to a plaintiff's serious medical need and failed to take steps to abate that risk. It may be demonstrated by either actual intent or reckless disregard. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference." *Id*. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding a defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

"Deliberate indifference" also entails more than mere negligence. *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835.

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, 128 L.Ed.2d 811. In interpreting *Farmer* and *Estelle*, this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott*, 182 F.3d at 1255; *Taylor*, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

*Farrow*, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill*, 40 F.3d at 1187 (quotation marks and citations omitted). "Cases stating a constitutional claim for immediate or emergency medical

attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id.*

> The seriousness of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious. An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that [t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188-89 (quotation marks and citations omitted) (footnotes omitted).  Further "whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quotation marks and citation omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).

### B.    Defendant Barry

#### (i) Plaintiff's Claims Asserted against Defendant Barry Fail to State a Claim  Upon Which Relief can be Granted

Plaintiff alleges that Defendant Barry acted deliberately indifferent to his serious medical needs when, on May 17, 2019, Defendant Barry only performed surgery on one of Plaintiff's hernias.  Because Defendant Barry failed to also perform surgery on his second hernia, Plaintiff alleges that he has suffered pain for years.

As noted above, Defendant Barry denies Plaintiff's claims and relies on Federal Rule of Civil Procedure 12(b)(6), along with Rule 12(b)(1), in his answer and motion.  Defendant Barry's motion directly challenges the merits of Plaintiff's federal claims.  "[A]s a general rule a claim cannot be dismissed for lack of subject matter jurisdiction because of the absence of a federal cause

of action." *Bell v. HCR Manor Care Facility of Winter Park*, 432 Fed. App'x 908, 910 (11th Cir. 2011) (quoting *Williamson v. Tucker,* 645 F.2d 404, 416 (5th Cir. 1981)) (footnote and internal quotations omitted).  "'The exceptions to this rule are narrowly drawn, and are intended to allow jurisdictional dismissals only in those cases where the federal claim is clearly immaterial or insubstantial.'"  *Id.* (quoting *Williamson*, 645 F.2d at 416); *see also Bell v. Hood,* 327 U.S. 678, 682-83 (1946) (explaining that a jurisdictional dismissal may be appropriate where the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such claim is wholly insubstantial and frivolous").  Because Plaintiff's § 1983 "claims formed the basis, and thus a substantial and material part, of [his] complaint the Court has jurisdiction, and therefore, Plaintiff's claims must be evaluated pursuant to Fed. R. Civ. P. 12(b)(6)."  *See id*. (citation omitted).[2]

Although Plaintiff filed this case utilizing the § 1983 form complaint for pro se litigants, to state a claim for relief under § 1983, "a plaintiff must allege an act which deprived him of a right, privilege, or immunity protected by the Constitution or laws of the United States, committed *by a person acting under color of state law.*"  *Gilliland v. Manord*, No. 617CV00795RDPHNJ, 2017 WL 3124333, at *2 (N.D. Ala. July 5, 2017), *report and recommendation adopted*, No. 617CV00795RDPHNJ, 2017 WL 3117012 (N.D. Ala. July 21, 2017) (citing *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010)) (emphasis added in original).

Plaintiff, however, fails to show Defendant Barry is a state actor.  "[A]llegations against private doctors who treat imprisoned patients, without more, do not suffice for Eighth Amendment, and hence § 1983, purposes."  *Gilliland*, 2017 WL 3124333, at *2 (citing *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009) ("... private organizations and their employees that have only an incidental and transitory relationship with the state's penal system usually cannot be said to have accepted, voluntarily, the responsibility of acting for the state and assuming the state's responsibility for incarcerated persons"); *Styles v. McGinnis*, 28 Fed. Appx. 362, 364 (6th Cir. 2001) (private physician who provided emergency staffing services to hospital as an independent contractor could not be considered a state actor for purposes of § 1983); *Pino v. Higgs*, 75 F.3d 1461, 1466 (10th Cir. 1996) (private emergency room physician not acting under color of state law for purposes of a § 1983 action by examining the plaintiff); *Ellison v. Garbarino*, 48 F.3d

---

[2]       Because Defendant Barry provided to the Court evidentiary material in support of his claims, the Court here applies the standard for a Rule 56 motion for summary judgment as set forth *supra* in Section I.

192, 197 (6th Cir. 1995) (private physician "in no way contractually bound to the state" deemed not a state actor under § 1983); *Nunez v. Horn*, 72 F.Supp.2d 24, 27 (N.D.N.Y. 1999) (orthopedic surgeon who performed surgery at private hospital on inmate pursuant to referral but absent contract with Bureau of Prisons not a state actor)).

Further, insofar as Plaintiff challenges Defendant Barry's medical decisions in treating his hernias, "'decisions [that] ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State' do not amount to state action." *Bell*, 432 Fed. App'x at 911 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982); *see also Greco v. Orange Mem'l Hosp. Corp.,* 513 F.2d 873, 877 (5th Cir. 1975) ("[A] private hospital is subject to the provisions of 42 U.S.C. § 1983 and the Fourteenth Amendment only if its activities are significantly affected with state involvement.") (footnote and internal quotations omitted).

Section "1983 [also] does not render complaints of negligence or medical malpractice actionable under the Constitution." *Gilliland*, 2017 WL 3124333, at *3 (citing *Daniels v. Williams*, 474 U.S. 327, 330 (1986) (an allegation of mere negligence is insufficient for violation of constitutional right); *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (medical malpractice claim is insufficient to establish liability under § 1983); *Howell v. Evans*, 922 F.2d 712, 719-20 (11th Cir. 1991) ("mere negligent diagnosis or treatment does not constitute deliberate indifference" but rather, "at most, medical negligence" which is not "a cognizable claim" under § 1983); *Katorie v. Dunham*, 108 Fed. Appx. 694, 698-699 (3d Cir. 2004) (private doctor's course of action motivated by his own medical judgment and not the result of state action)).

In sum, Plaintiff's claims asserted against Defendant Barry, as amended and supplemented, "target[] merely private conduct, which § 1983 does not reach. The treatment decisions that form the basis of [Plaintiff's] complaint constitute medical judgments made by private parties and therefore fall outside the ambit of § 1983." *Bell*, 432 Fed. App'x at 911 (citations omitted). Critically, while Plaintiff asserts Defendant Barry acted in deliberate indifference to his serious medical needs, because Defendant Barry is not a state actor, the relief Plaintiff seeks is unattainable under § 1983. Because Plaintiff's allegations asserted against Defendant Barry fail to state a claim upon which relief may be granted, Defendant Barry's motion for summary judgment (Doc. 16), is due to be GRANTED.

*(ii) The Exercise of Supplemental Jurisdiction*

Plaintiff's claims asserted against Defendant Barry, liberally construed, implicate the state torts of negligence or medical malpractice. Review of such claims is only appropriate upon exercise of the Court's supplemental jurisdiction. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). In the posture of this case, however, the exercise of such jurisdiction is inappropriate.

For a federal court "[t]o exercise [supplemental] jurisdiction over state law claims not otherwise cognizable in federal court, 'the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a "common nucleus of operative fact."'" *L.A. Draper and Son v. Wheelabrator Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984). The exercise of supplemental jurisdiction is discretionary. *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). "If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims." *L.A. Draper and Son*, 735 F.2d at 428. In view of the Court's finding that Plaintiff's allegations asserted against Defendant Barry fail to state a claim upon which relief may be granted, Plaintiff's state tort claims asserted against Defendant Barry are due to be dismissed. *Gibbs*, 383 U.S. at 726 (if the federal claims are dismissed prior to trial, the state claims should be dismissed as well); *see also Ray v. Tennessee Valley Authority*, 677 F.2d 818 (11th Cir. 1982).

## C.   Defendant Headley

### *(i) Defendant Headley, Warden at Staton, did not act deliberately indifferent to Plaintiff's serious medical needs*

Plaintiff alleges Defendant Headley acted deliberately indifferent to his serious medical needs because Plaintiff wrote Defendant Headley a grievance that went unanswered. *See* Doc. 1 at 5. Defendant Headley denies any responsibility for Plaintiff's medical care while confined at Staton and further asserts that he is entitled to sovereign and qualified immunity. *See* Docs. 13, 14. Defendant Headley also argues that he cannot be held liable in this action under the basis of *respondeat superior* and, because he is not a medical provider, Defendant Headley has no liability under the state medical liability act for negligent medical care. Doc. 13 at 12; *see also* Doc. 14 at 5.

It is clear from the pleadings filed in this case that Defendant Headley is not a health care professional and is named as a defendant in this case solely due to his supervisory position as

Warden at Staton.  To the extent Plaintiff seeks to implicate Defendant Headley based on the conduct of his subordinates under the concept of *respondeat superior*, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)).  Even if supervisory liability under § 1983 cannot be established by the supervisor's personal participation in the complained acts, liability may be shown by "the existence of a causal connection linking the supervisor's actions with the violation." *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988).

Although § 1983 requires a connection between the official's acts or omissions and the plaintiff's injury, an official also may be liable where a policy or custom that he established or utilized resulted in deliberate indifference to an inmate's constitutional rights.  [*Marsh v. Butler County, Alabama,* 268 F.3d 1014, 1059 (11th Cir. 2001) *(en banc)*]." *Salas v. Tillman,* 162 Fed. Appx. 918, 922 (11th Cir. 2006).

Plaintiff has presented no evidence to create a genuine issue of disputed fact with respect to the claim that Defendant Headley acted with deliberate indifference to his medical needs. Nothing before the Court indicates that Defendant Headley personally participated in or had any direct involvement with the medical treatment provided to Plaintiff.  Additionally, the undisputed evidentiary materials demonstrate that medical personnel made all decisions relative to the course of treatment provided to Plaintiff and further establish that such treatment did not result from a policy instituted by Defendant Headley.  The law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs,* 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment).

The record is completely devoid of evidence that Defendant Headley had knowledge of specific facts from which an inference could be drawn that a substantial risk of harm existed to Plaintiff, that Defendant Headley actually drew this inference and thereafter ignored the risk. Plaintiff has therefore failed to establish the requisite element of subjective awareness on the part of Defendant Headley. *Carter,* 352 F.3d at 1350.  Consequently, Defendant Headley's motion for

summary judgment (Doc. 13), is due to be GRANTED.

### D.   Wexford Defendants

#### (i)   *Plaintiff's claims asserted against Defendant Wexford fail to show an unconstitutional policy or custom*

Defendant Wexford argues that Plaintiff's claims are due to be dismissed because Plaintiff "has no evidence that any policy or practice of Wexford created a constitutional deprivation that led to the injuries alleged by [Plaintiff]."  Doc. 31 at 4.  The Court agrees with Defendant Wexford. Nowhere in Plaintiff's pleadings does he offer any evidence that Defendant Wexford has a policy or custom that contributed to Plaintiff's alleged constitutional violations.  Rather, Plaintiff makes the conclusory statement that "[D]efendants did willfully neglect his needs due to [Defendant Wexford's] standards."  Doc. 35 at 4.

As previously explained, the law is settled that, generally, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."  *Hartley*, 193 F.3d at 1269 (quotation marks and citation omitted). The Eleventh Circuit has extended that rule to private corporations like Defendant Wexford.  *See, e.g.*, *Craig v. Floyd Cty*., 643 F.3d 1306, 1310 (11th Cir. 2011).  Where the state and the entity enter such a contractual agreement, the private healthcare company is a "person" acting under color of state law, and thus may be liable under § 1983.  *Howell v. Evans*, 922 F.2d 712, 723-24 (11th Cir.) *vacated pursuant to settlement*, 931 F.2d 711 (11th Cir. 1991), *and opinion reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994) (internal citation omitted).  By virtue of the contract, the private entity also "performs a function traditionally within the exclusive prerogative of the state and becomes the functional equivalent of the municipality under section 1983."  *Craig*, 643 F.3d at 1310 (internal quotation marks omitted).  Accordingly, under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978) (holding that a municipality cannot be held liable on a theory of *respondeat superior*), a private entity providing medical services to inmates pursuant to a contract with the state is only liable under § 1983 where it employs a custom or policy constituting deliberate indifference to an inmate's serious medical need.  *See Howell*, 922 F.2d at 724 n.13 (noting that the policy or custom analysis applied to a corporation is the same as the analysis applied to municipalities under *Monell*).  To hold a defendant liable as a supervisory official, a plaintiff must show that "the supervisor personally participate[d] in the alleged

constitutional violation or [that] there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Hartley*, 193 F.3d at 1269.

The challenged policy or custom need not be express. A policy is "a decision that is officially adopted" or created on behalf of the entity. *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A custom is any practice that is "so settled and permanent" as to carry the force of law. *Id*. To establish the existence of a custom, the evidence must show more than an isolated incident leading to constitutional injury, and instead, must reflect the pattern is widespread. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). To show the practice at issue is sufficiently widespread to constitute a custom, a plaintiff ordinarily must produce evidence that the practice resulted in deficient treatment of other inmates. *See Craig*, 643 F.3d at 1312. Ultimately, the plaintiff must produce sufficient evidence of a "series of constitutional violations from which deliberate indifference can be inferred." *Id*. (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)).

On this record, Plaintiff has not produced sufficient evidence to establish a genuine dispute of material fact regarding whether Defendant Wexford implemented a policy or custom evidencing deliberate indifference to his serious medical needs. Specifically, Plaintiff produces no evidence of a custom or policy implemented by Defendant Wexford to withhold medically necessary medical care or treatment to save money nor evidence of a permanent widespread practice to deny necessary medical care or treatment to inmates to control costs. *See Craig*, 643 F.3d at 1310 (explaining that to impose liability under § 1983, a plaintiff must prove that a municipality had a "policy or custom" of deliberate indifference that led to the violation of his constitutional right). Wexford Defendants' motion for summary judgment (Doc. 31) is, therefore, due to be GRANTED on Plaintiff's Eighth Amendment claim asserted against Defendant Wexford. *See Hartley*, 193 F.3d at 1269.

> ### *(ii)   Plaintiff's claims asserted against Defendants Thomas and Anthony fail to show either defendant acted deliberately indifferent to his serious medical needs*

Plaintiff also asserts Defendants Thomas and Anthony violated his Eighth Amendment rights in connection with his medical care at Staton. *See* Docs. 1, 12, 37, 41, 42, 43, 47, 52, 58. Plaintiff asserts Defendants Thomas and Anthony failed to adequately treat his hernia and ear pain, a growth, and weight loss. Defendants deny Plaintiff's allegations and assert his complaint, as

amended and supplemented, fails to show that either defendant acted deliberately indifferent to his serious medical needs. *See* Doc. 31.

Defendants Thomas and Anthony's evidence includes affidavits and Plaintiff's medical records while confined at Staton. Docs. 31-1, 31-2, 32-1, 49-1, 49-2.

Defendant Thomas testifies that she is a nurse practitioner licensed to practice in Alabama. Doc. 31-1 at 1. Defendant Thomas is currently employed as a nurse at Staton by Defendant Wexford and denies that Plaintiff has been denied or delayed medical care. *Id.* at 1, 4. Defendant Thomas testifies, to the extent Plaintiff asserts constitutional deprivations relating to his hernia treatment, Defendant Thomas' "scope of practice is limited" and that Defendant Barry treated Plaintiff's hernia, Plaintiff's "small right inguinal hernia is currently being followed by the medical staff at Staton[,]" and Plaintiff "will be returned to see [Defendant Barry] if there are any changes in the status of his right inguinal hernia." *Id.* at 2-3. The decision of whether to perform surgery on Plaintiff's right hernia will be determined by Defendant Barry. *Id.* at 3. Defendant Thomas testifies that Plaintiff "has been seen frequently by the outside specialist surgeon and that the medical staff at Staton rely on the recommendations and treatment of the outside specialist." *Id.* at 2.

As to Plaintiff's allegations that his weight loss is being ignored at Staton, Defendant Thomas testifies that in 2017 and 2018, Plaintiff's weight was stable, that Plaintiff's maximum weight in 2019 was 154 pounds, and that Plaintiff's lowest weight in 2019 was 122 pounds. Doc. 32-1 at 4. Defendant Thomas testifies that Plaintiff shows a weight loss of 32 pounds and that Plaintiff's body mass index for his lowest weight in 2019 "would be reflected as normal weight. . . ." *Id.* Insofar as Plaintiff alleges medical personnel at Staton fail to provide Plaintiff with medical testing, Defendant Thomas testifies:

> [T]he review of [Plaintiff's] medical chart reveals that on March 18, 2019, indicates that at utilization management was submitted for [Plaintiff] for left inguinal hernia repair, along with a utilization management for a colonoscopy due to [Plaintiff's] complaint of left abdominal pain. An alternative plan was submitted of care for the repair of the left inguinal hernia as well as a resubmission for a colonoscopy if the abdominal pain was not resolved. A follow-up note post operation of the hernia repair indicated that [Plaintiff's] abdominal pain was resolved.
>
> Lab tests contained in [Plaintiff's] chart from May 2019 reveal no indication of organ disease or anemia.

> [Plaintiff's] complaint of no upper GI or screening colonoscopy is unfounded as inmates do not have age related screening colonoscopies. There is no indication found in the review of [Plaintiff's] chart for the necessity of an upper GI procedure. [Plaintiff] reveals that his mother suffered from throat cancer, although there was no additional family cancer in [Plaintiff's] medical chart indicating the necessity for the medical tests requested of [Plaintiff]. . . .

*Id*. at 4-5.

Defendant Anthony is a licensed nurse (LPN) licensed to practice as an LPN in Alabama. Doc. 49-1 at 1. Defendant Anthony is employed by Defendant Wexford as an LPN and the Ombudsman at Staton. *Id*. Defendant Anthony testifies that, as the Ombudsman at Staton, he is "responsible for receiving and responding to medical grievances by Alabama state inmates. . . ." *Id*. at 2. In response to Plaintiff's allegation that he filed a grievance on July 3, 2019, and received no response, Defendant Anthony asserts, "[p]rior to [Plaintiff] completing his medical grievance on July 3, 2019, [Plaintiff] completed a sick call request on June 7, 2019, that was responded to by the nurse on the same date, June 7, 2019." *Id*. Plaintiff's medical records support Defendant Anthony's testimony. *See* Doc. 31-2 at 50. Defendant Anthony further testifies:

> On July 6, 2019, [Plaintiff] completed a Release of Responsibility form refusing to be seen by the health care provider.
>
> On July 11, 2019, [Plaintiff] completed another sick call request stating that he needed to be seen for a follow-up appointment for his surgery.
>
> The sick call was reviewed by the RN on July 11, 2019.
>
> On July 15, 2019, [Plaintiff] did not show up for his follow up appointment with the provider.
>
> The medical chart entry reveals that [Plaintiff] was in fact seen by the medical provider on July 24, 2019.

Doc. 49-1 at 2-3. Defendant Anthony's testimony is supported by Plaintiff's medical records. *See* Docs. 31-2 at 55-58, 32-1 at 3-4.

Assuming Plaintiff's condition presents a serious medical need, which is not in dispute, Plaintiff presents no evidence sufficient to create a genuine issue of disputed fact regarding the claim that either Defendant Thomas or Defendant Anthony acted with deliberate indifference to his medical needs. As to Plaintiff's allegations that Defendants Thomas and Anthony denied, delayed, or provided ineffective treatment of his hernia, weight loss, or ear pain, "to recover on

[his] claim[s] of inadequate medical care, [Plaintiff] had to prove that [Defendants Thomas and Anthony] engaged in 'acts or omissions sufficiently harmful to evidence deliberate indifference to [his] serious medical needs.'" *Hamm*, 774 F.2d at 1574-75 (citing *Estelle*, 429 U.S. at 106) (further citation omitted).

While Plaintiff claims he should have received different medical care or should have been referred earlier to a specialist for his right hernia or eardrum pain, his evidence supporting these claims, is sparse. Plaintiff provides no expert or other evidence that either Defendant Thomas' or Defendant Anthony's actions failed to meet appropriate professional standards. The only evidence concerning these allegations are Plaintiff's sworn amended complaint as amended and supplemented and his medical grievances.

Plaintiff's medical records demonstrate, however, Plaintiff received extensive medical treatment while at Staton. *See* Doc. 31-2. Plaintiff's medical records demonstrate that Plaintiff was seen and treated nearly every month and sometimes several times a month for his medical complaints. Plaintiff's medical grievances further show that he received timely and appropriate responses to his many complaints throughout 2019.

Staton's medical personnel treated Plaintiff for numerous medical conditions over the relevant time, including Plaintiff's hernia and eardrum pain. For his hernia, Plaintiff was referred to outside specialist Defendant Barry, who successfully performed surgery on Plaintiff's left inguinal hernia. Defendant Barry testifies that he informed Plaintiff of his small right hernia, that Plaintiff did not know that he had a small hernia, and that the small hernia did not require surgery. Defendant Thomas further testifies that Staton medical personnel continue to monitor Plaintiff's hernia and will refer Plaintiff to a specialist if they see any changes. For his eardrum, pursuant to Plaintiff's own pleadings, Plaintiff was also referred to an outside specialist and received two surgeries to repair his eardrum.

While the Court commiserates with Plaintiff's medical conditions, the Court finds neither Defendant Thomas nor Defendant Anthony acted deliberately indifferent to his medical needs during the relevant time. Further, insofar as Plaintiff asserts either Defendant Anthony or Defendant Thomas acted deliberately indifferent to his weight loss in 2019, as Defendant Thomas testifies, Plaintiff's medical records show that medical staff weighed Plaintiff on numerous occasions throughout 2019, and while Plaintiff lost approximately 30 pounds, there is nothing in Plaintiff's medical history to suggest medical personnel should be compelled to provide

colonoscopy tests to Plaintiff simply because of his age.  Also testified by Defendant Thomas is that, even at Plaintiff's lowest weight, Plaintiff is still considered within the normal range on the body mass index.  Plaintiff does not dispute this testimony.  Lab tests contained in Plaintiff's chart from May 2019 also reveal no indication of organ disease or anemia.

Plaintiff's medical records further show, when Plaintiff followed the appropriate procedure to request medications, medications were provided to Plaintiff, including ibuprofen, Zantac, Zyrtec, and Tums.  Plaintiff was also provided a truss for his hernia discomfort.

In short, upon review of Plaintiff's medical records, it is clear Plaintiff received significant medical care while at Staton during the relevant time.  "Although [Plaintiff] may have desired different modes of treatment, the care [Defendants Thomas and Anthony] provided did not amount to deliberate indifference."  *Hamm*, 774 F.2d at 1574-75 (citing *Bass v. Sullivan,* 550 F.2d 229, 231-32 (5th Cir.), *cert. denied,* 434 U.S. 864 (1977); *accord, Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (1st Cir.1981) ("Where a prisoner has received ... medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law.")).

Insofar as Plaintiff alleges either Defendant Thomas or Defendant Anthony withheld treatment, Plaintiff's evidence does not create a genuine issue of material fact as to this claim.  In his complaint as amended and supplemented, Plaintiff maintains that his hernia and eardrum treatments were denied or delayed, his prescription medications were delayed, and that Defendant Anthony failed to respond to his July 3, 2019, grievance.

As noted above, however, Plaintiff was seen on a regular and consistent basis by medical personnel and was prescribed treatment for his medical complaints.  Defendants' evidence further shows that, before Defendant Anthony could complete the response to Plaintiff's July 3, 2019, medical grievance, Plaintiff completed a sick call request on June 7, 2019, that was responded to by the nurse that same day.  *See* Doc. 31-2 at 50.  The undisputed evidence reflects Plaintiff received timely and appropriate access to prison medical providers during his confinement at Staton who examined and treated Plaintiff for his medical conditions.

The record demonstrates medical personnel at Staton responded to Plaintiff's complaints and provided medical care for Plaintiff consistent with his medical history.  Their responses to Plaintiff's condition, as attested to by Defendants Thomas and Anthony and uncontroverted by Plaintiff, were reasonable and appropriate.  Indeed, the testimony of both Defendant Thomas and

Anthony is corroborated by the contemporaneously compiled objective medical records.  The law is settled that "[s]elf serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records," and they do not do so here. *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990)).   While the record clearly shows Plaintiff required significant medical treatment during his incarceration in Staton, Plaintiff presents no evidence showing the way Defendants Anthony and Thomas—or any medical personnel—addressed his medical concerns or condition created a substantial risk to his health that the attending health care personnel consciously disregarded.   The record is therefore devoid of evidence—significantly probative or otherwise—showing that Defendants Anthony and Thomas acted with deliberate indifference to a serious medical need experienced by Plaintiff. *Farmer*, 511 U.S. 825; *Quinones*, 145 F.3d at 168. Accordingly, Wexford Defendants' motion for summary judgment (Doc. 31), as to Plaintiff's Eighth Amendment claims asserted against Defendants Thomas and Anthony is due to be GRANTED.

### *(ii) The Exercise of Supplemental Jurisdiction*

Plaintiff's claims asserted against Wexford Defendants, liberally construed, implicate the state torts of negligence or medical malpractice.  As noted *supra*, review of such claims is only appropriate upon exercise of the Court's supplemental jurisdiction. *See Estelle*, 429 U.S. at 106. In the posture of this case, however, the exercise of such jurisdiction is inappropriate.

For a federal court "[t]o exercise [supplemental] jurisdiction over state law claims not otherwise cognizable in federal court, 'the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a "common nucleus of operative fact."'" *L.A. Draper and* Son, 735 F.2d at 427.  The exercise of supplemental jurisdiction is discretionary. *United Mine Workers*, 383 U.S. 715.  "If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims." *L.A. Draper and Son*, 735 F.2d at 428.  In view of the Court's finding that Wexford Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claims, Plaintiff's state tort claims asserted against Wexford Defendants are due to be dismissed. *Gibbs*, 383 U.S. at 726 (if the federal claims are dismissed prior to trial, the state claims should be dismissed as well); *see also Ray*, 677 F.2d 818.

### E.    Medical Copayment

Last, Plaintiff also appears to challenge the assessment of a copayment for partial payment of costs attendant to medical treatment provided by nurses, providers, and for his medications. *See e.g.*, Doc 1 at 5.

The charging of a copayment for medical treatment provided to a prisoner, standing alone, does not violate the Constitution. The simple fact that Plaintiff may be charged a nominal fee or copayment for medical treatment does not in any way deprive him of a protected right, privilege or immunity. *Shapley v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir. 1985) (imposition of fee for medical treatment provided to an inmate does not amount to a constitutional violation); *Jones v. Corizon, et al.*, 2015 WL 5013954 at *17 (M.D. Ala. 2015), affirmed on appeal February 18, 2016 (charging of copayment for treatment provided each time inmate seeks treatment through the sick call process does not violate the Constitution); *Bester v. Wilson*, 2000 WL 1367984 at *8 (S.D. Ala. 2000)("[T]he charging of a fee to prisoners for medical treatment from their [available] funds has been held to be constitutional when challenged on several due process and Eighth Amendment grounds."). The record is devoid of evidence indicating that Plaintiff was denied medical treatment due to any inability to pay the fee; instead, the evidentiary materials establish that Plaintiff received medical treatment regardless of whether he had the ability to provide a copayment. Because Plaintiff fails to allege a violation of his constitutional rights with respect to the assessment/collection of fees associated with medical treatment, all defendants are entitled to summary judgment on this claim.

### IV.    Conclusion

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motions for summary judgment filed by Defendant Headley (Doc. 13), Defendant Barry (Doc. 16), and Wexford Defendants (Doc. 31) be GRANTED.[3]

---

[3]      While the Court recommends granting all defendants' motions for summary judgment, to the extent any named defendant seeks reimbursement of all costs and fees incurred in defense of this action, the Magistrate Judge recommends denying this request. "Under [42 U.S.C.] § 1988, a prevailing defendant is entitled to recover attorney's fees if 'the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" *Sibley v. Levy*, 203 F. App'x 279, 280–81 (11th Cir. 2006) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)). To determine "whether a suit is frivolous, a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Id.* (quoting *Sullivan v. Sch. Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir.1985)) (internal quotations and citation omitted). "The three factors we have noted to be used in determining if a claim was frivolous are: '(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits.'" *Id.* (quoting

2.  Plaintiff's state law claims be DISMISSED without prejudice to Plaintiff's right to refile this action in an appropriate forum.

3.  Judgment be ENTERED in favor of Defendants Headley and Barry, and Wexford Defendants.

4.  This case be DISMISSED with prejudice.

5.  No costs be taxed.

**On or before April 18, 2022**, the parties may file an objection to the Recommendation. Any objection filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised this Recommendation is not a final order and, therefore, it is not appealable.

Failure to file a written objection to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done, this 4th day of April 2022.

/s/ CHARLES S. COODY
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

---

*Sullivan*, 773 F.2d at 1189).  While the Eleventh Circuit acknowledges frivolous cases may be dismissed on summary judgment (*id.*), here, the Court recommends dismissal, without prejudice, Plaintiff's state law claims asserted against Defendants Barry and Wexford Defendants.  Based on a review of the record, the Court does not find this case to be frivolous and recommends denying any request for reimbursement.